| | | |
|---|---|---|
| ANTHONY MARANO COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12 C 1906 |
| | ) | |
| J & S PRODUCE CORP, GEORGE PAPPAS, | ) | Judge Sara L. Ellis |
| BELMONT BANK & TRUST COMPANY, | ) | |
| and SOUTH CENTRAL BANK, NATIONAL | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Having been left holding the bag in unpaid produce bills, Plaintiff Anthony Marano

Company ("Marano") brought this action against J&S Produce Corp. ("J&S"), its principals, and

two banks that serviced J&S. Fourteen additional parties intervened as Plaintiffs. Marano and

the Intervening Plaintiffs (collectively, "Plaintiffs") sue Defendants pursuant to the Perishable

Agricultural Commodities Act, 7 U.S.C. § 499a *et seq.* ("PACA"), seeking to recover damages

resulting from the approximately $1,643,000 in produce Plaintiffs delivered to J&S and for

which Plaintiffs were not paid. The parties do not dispute that J&S's failure to pay its PACA

creditors constitutes a breach of the PACA trust. As such, Plaintiffs seek to exercise their rights

as PACA trust beneficiaries to recover the principal amount owed as well as interest and

attorneys' fees. With J&S and its principals no longer parties to this suit,[1] Plaintiffs seek to

disgorge payments that J&S made to Defendants South Central Bank and Belmont Bank.

---

[1] Plaintiffs have settled their claims against J&S and its principals. *See* Doc. [199, 223, 226].
Therefore, Plaintiffs' requests for summary judgment against J&S and George Pappas are rendered
moot. Because Intervening Plaintiff Central Produce seeks summary judgment only against J&S and
George Pappas, its motion [158] is denied in its entirety as moot.

Now before the Court are five cross-motions for summary judgment. Plaintiffs allege that South Central and Belmont improperly received PACA trust assets when J&S transferred hundreds of thousands of dollars to each bank, mostly in the form of loan payments. As PACA beneficiaries, Plaintiffs are entitled to priority over the PACA trust assets ahead of even secured creditors like South Central and Belmont. *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 669 (7th Cir. 2002). Therefore, Plaintiffs seek to disgorge PACA trust funds that South Central and Belmont received from J&S. South Central and Belmont respond by arguing primarily that Plaintiffs cannot disgorge these payments because the banks were bona fide purchasers, as they received the payments for value and without knowledge that J&S had breached its PACA trust obligations. South Central also raises a number of other defenses, including that revolving loan payments cannot be disgorged because Plaintiffs were not harmed by those payments, and that the payments on a loan from J&S's affiliate Reliable Food Distribution Center, Inc. ("Reliable") cannot be disgorged because those payments were never PACA trust assets.

The Court denies Plaintiffs' motions for summary judgment [146, 149[2]], as questions of fact regarding the banks' knowledge of J&S's breach preclude summary judgment. The Court also denies Belmont's motion for summary judgment [161] because questions of fact regarding Belmont's knowledge of J&S's breach preclude summary judgment. The Court grants South Central's request for summary judgment [175] only with regard to the payments on the Reliable Loan, as the record shows that these funds came from Reliable and were merely parked in J&S's account for a matter of days before J&S transferred the funds to South Central. The Court denies

---

[2]     Agri Sales Group filed its own motion for summary judgment [149], but it did not offer an independent rationale. Instead, Agri Sales Group adopts the arguments in Plaintiff and Intervening Plaintiffs' motion for summary judgment [146]. Therefore, the Court will apply the same analysis to both motions.

South Central's motion with regard to all other payments because questions of fact regarding South Central's knowledge of J&S's breach of the PACA trust preclude summary judgment.

## BACKGROUND[3]

Plaintiffs are wholesalers of "perishable agricultural commodities," commonly known as produce. J&S purchased wholesale quantities of produce from Plaintiffs and sold it to other customers. J&S also sold dry goods, which made up approximately 50% of its business. Plaintiffs are licensed produce dealers under PACA. Plaintiffs delivered millions of dollars' worth of produce to J&S and invoiced J&S for the produce. Plaintiffs included on those invoices language required by 7 U.S.C. § 499e(c)(4) indicating Plaintiffs' intent to preserve their PACA trust benefits. J&S filed for bankruptcy in March of 2012 and has failed to pay Plaintiffs for approximately $1,643,000 in produce that Plaintiffs delivered. The vast majority of unpaid invoices were dated between June 24, 2011 and March 21, 2012. However, J&S also failed to pay invoices from Intervening Plaintiff Strube Celery & Vegetable, Co. ("Strube") dated between April 10, 2010 and April 23, 2010.

Defendants South Central Bank and then Belmont Bank were J&S's primary banks during the relevant period. South Central served as J&S's primary bank from 2004 until May of 2010. During this time, South Central provided loans to and housed the accounts of J&S and its affiliates. J&S moved its business to Belmont in May of 2010. Like South Central, Belmont provided multiple loans to J&S and housed J&S's accounts.

---

[3] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1. In assessing each motion for summary judgment, the statements are taken in the light most favorable to the non-movant. The Court has considered the parties' responses to the statements of fact and supporting exhibits and has included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motions for summary judgment.

Specifically, South Central provided J&S with a line of credit in the amount of $300,000. South Central also provided J&S with a mortgage loan in the amount of $2.6 million securing the real property at 2300 W. Lake Street in Chicago, from which J&S operated. Both the line of credit and the mortgage loan were secured by all of J&S's assets, including its accounts receivable, inventory, and equipment. The mortgage loan and the line of credit were also cross-collateralized, meaning that the security interest given in the collateral would secure any other liabilities that J&S owed to South Central. The loans also provided South Central with a right of set-off against all of J&S's accounts to the extent permitted by law. J&S's principals James Stamas and Steve Pappas personally guaranteed the loans. The loan agreements entitled South Central to examine and audit J&S's books and records and required J&S to provide South Central with tax returns, quarterly balance sheets, and audited annual balance sheets and income statements.

The revolving line of credit afforded J&S with access to additional cash by automatically transferring money to J&S when the balance in J&S's checking account was low and automatically transferring funds from J&S's checking account back to South Central when the account balance was higher. Plaintiffs seek to disgorge $565,264 in payments from J&S to South Central on the revolving line of credit between January 4, 2010 and August 31, 2011. Because of the nature of the line, South Central transferred $582,442 to J&S over that same period of time.

In addition to the line of credit and the mortgage loan, J&S and its affiliate, Reliable, jointly entered into a Small Business Administration Loan with South Central in August of 2008 (the "Reliable Loan"). The Reliable Loan provided J&S and Reliable with $600,000, which was to be repaid from J&S and Reliable's business operations. The loan was cross-collateralized by a

security interest in all assets of J&S and Reliable.  The loan document noted that "[p]erishable agricultural commodities are subject to super priority interest under PACA."  Doc. 148 ¶ 16 (alteration in original).  To repay the loan, Reliable made monthly payments of $8,900 to J&S from January through July of 2011.  Shortly after receiving each payment, J&S transferred $8,910 to South Central, which included a $10 service fee.  J&S transferred a total of $62,350 to South Central related to the Reliable Loan.[4]  Plaintiffs seek to disgorge five of these seven payments, totaling $44,550.

While doing business with South Central, J&S's financial performance showed signs of strength, while other factors predicted its eventual bankruptcy.  For example, prior to the facts that brought about this case, J&S failed to pay its PACA creditors on three separate occasions.  First, in August of 2009, a judge in this district entered a temporary restraining order against J&S in response to an unpaid debt J&S owed to Windsor Distributing Inc., one of its suppliers.  *See Windsor Distributing, Inc. v. J&S Produce Corp., et al*, No. 09 C 5122, Doc. 14 (N.D. Ill. Aug. 27, 2009).  In response to the *Windsor* suit, South Central reviewed J&S's accounts receivable, assigned J&S a higher risk code, and temporarily added J&S to a "watch list."  Windsor and J&S settled, with J&S paying the $62,112 it owed to Windsor on August 28, 2009.

In early 2010, Intervening Plaintiff Gourmet's Finest (also known as "Domestic Mushroom Co.") filed a PACA action against J&S in case number 10 C 1435.  On March 30, 2010, Gourmet's Finest and J&S entered a stipulation stating that "Gourmet's Finest was an unpaid PACA trust creditor on a debt for produce from October 17, 2009 through March 10, 2010 in the total trust amount of $395,611.03."  Doc. 148 ¶ 25.  J&S agreed to pay Gourmet's Finest pursuant to a payment plan.  J&S complied with the payment plan until March of 2012,

---

[4]     The record does not reveal why seven payments of $8,910 would equal $62,350, rather than $62,370, but the distinction is not material to this Opinion.

when it became unable to pay.  To date, J&S has not fully satisfied its obligation to Gourmet's Finest.

J&S also failed to pay Intervening Plaintiff Strube on invoices dated between April 10, 2010 and April 23, 2010.  J&S entered into an informal payment plan with Strube and made some payments, but never completely satisfied its debt to Strube.  In addition to the April 2010 debt, J&S also failed to pay Strube invoices dated between March 15, 2012 and March 21, 2012.

In August of 2009, South Central reviewed J&S's income statements, balance sheets, and cash flow statements for 2006 through 2008 and determined that J&S's accounts payable increased from $990,633 at the end of 2006 to $1,670,714 at the end of 2008.  South Central informed J&S in early September of 2009 that it would not extend any further credit, including covering checks returned for insufficient funds, until J&S could demonstrate that it had sufficient working capital to ensure that it would not be subject to any further PACA claims.  From November of 2009 through October of 2010, J&S's accounts at South Central were regularly overdrawn, resulting in dozens of overdraft charges.  Doc. 153 at 38–46.

J&S requested that South Central increase its available line of credit at least twice.  First, in June or July of 2009, Steve Pappas of J&S requested that South Central double the amount of J&S's line of credit from $300,000 to $600,000.  South Central refused to increase the revolving line of credit "because of the special risks commercial banks have in financing produce companies as a result of [PACA]."  Doc. 216 ¶ 1.  In early 2010, J&S again requested that South Central increase the size of J&S's revolving line of credit, this time to $500,000.  J&S provided South Central with specific financial information concerning its need for additional credit.  South Central also declined that request, noting that South Central "is a small bank and did not want to extend significant credit to a produce supplier—any produce supplier—in light of the restrictions

on South Central Bank's ability to take security interests under [PACA]." Doc 174-1 ¶ 7. James Stamas, one of J&S's owners, testified that South Central declined to increase the line of credit in part because J&S's accounts payable were outstanding for an average of 68 days, more than double the industry average of approximately 30 days. Doc. 148-5 at 25; Doc. 153-1 at 10.

South Central placed J&S back on its "watch list" in March of 2010. South Central also demanded immediate repayment of the $300,000 line of credit, plus interest and late charges. In response, J&S paid down some of the balance on the loan and deposited funds into its operating account. In April of 2010, South Central notified J&S that it had defaulted on its line of credit pursuant to the "reasonable insecurity" provision in the loan agreement. J&S remained on South Central's watch list until its loans were completely paid off in September of 2010.

In light of South Central's repeated refusal to increase J&S's line of credit, J&S decided to move its business to Belmont. In May of 2010, Belmont conducted a credit review analysis of J&S, which included reviewing J&S's balance sheet as of December 31, 2009. The balance sheet showed assets of $3.1 million, accounts payable of $1.48 million, and J&S's average "accounts payable days" of 68 days. On May 19, 2010, Belmont extended J&S a revolving line of credit in the amount of $700,000, cross-collateralized by a security interest in all of J&S's and Reliable's assets. J&S also entered a Business Loan Agreement with Belmont that required J&S to maintain its deposit accounts at Belmont and provided Belmont with access to certain financial information, such as J&S's balance sheets, tax returns, and income statements.

Additionally, Belmont provided a $2.5 million mortgage loan agreement secured by the property at 2300 W. Lake Street. The borrower on the mortgage was listed as "2300 W. Lake Street Unit A, LLC," while J&S, Reliable, and their individual owners served as guarantors on the mortgage loan. Doc. 163 ¶ 53. The mortgage loan document notes that two of the risks of

providing the loan were "Guarantor's lack of liquidity" and "[s]ales of tenant trending downwards due to general economic recession but showing signs of recovery in 2010." Doc. 153-1 at 43. The amount of the mortgage loan was later increased to $2.62 million.

In September of 2010, Belmont paid off the revolving line of credit and the mortgage loan that J&S had taken out from South Central. In November of 2010, Belmont agreed to provide J&S with an additional $70,000, in the form of a promissory note. Like the loans from South Central, all of Belmont's loans to J&S were personally guaranteed by J&S's principals, cross-collateralized, and included a right of set-off.

J&S paid its PACA creditors on all invoices dated between April 23, 2010 and June 24, 2011, but J&S often paid invoices late. Beginning in the summer of 2010, J&S's demand deposit account at Belmont was regularly overdrawn, including by $44,000 at the end of September, 2010. Belmont charged J&S hundreds of overdraft fees during this time.

Although Belmont never fully reviewed or audited J&S's books and records, it requested and received Accounts Receivable Aging Reports from J&S on at least five occasions between May of 2010 and May of 2011. Belmont also monitored, albeit intermittently, J&S's accounts payable. In December of 2010, Belmont received an Accounts Payable Aging Report as of September 30, 2010, showing that J&S owed over $500,000 in payables that were more than 30 days old, but only $70,523 that were more than 90 days past due. Belmont also received a March 31, 2011 Accounts Payable Aging Report that showed over $625,000 in payables that were more than 30 days old. Further warning of J&S's financial difficulty, in May of 2011 Belmont received a balance sheet from J&S, which included a Note Payable to Gourmet's Finest in the amount of $258,313 relating to the March 30, 2010 stipulation between J&S and Gourmet's Finest. This is the first time that Belmont learned of J&S's debt to Gourmet's Finest.

However, much of the news on the March 31, 2011 balance sheet was positive for J&S, as it indicated current assets of $3.95 million and accounts payable of $1.53 million.

In June of 2011, Belmont increased J&S's line of credit to $900,000. In February of 2012, Belmont provided J&S with a $75,000 commercial loan secured by a UCC lien on J&S and on the principal residence of James Stamas.

Payments on the line of credit, the mortgage, and the business loans all came from J&S's checking account maintained at Belmont. Between July 30, 2010 and March 30, 2012, Belmont received a total of $676,654 from the J&S checking account, which it applied to the loan balances and various bank fees and overdraft charges owed to Belmont. Belmont asserts that it only became aware that J&S "was or could be in violation of PACA trust obligations" in March of 2012, when it received the pleadings in this case. Doc. 163 ¶ 35.

On March 21, 2012, the Court entered a temporary restraining order freezing J&S's assets. J&S filed for Chapter 7 bankruptcy relief on March 26, 2012, in case number 12 BK 12063. As of August 31, 2013, J&S had only $67,882 in accounts receivable on deposit at Belmont. J&S owes approximately $1,643,000 to Plaintiffs, exclusive of interest and attorneys' fees.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material

fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.,* 293 F.3d 402, 404 (7th Cir. 2002). Therefore, when considering Plaintiffs' motions for summary judgment, the Court views all evidence in the light most favorable to Defendants; and when considering Defendants' motions, the Court views all evidence in the light most favorable to Plaintiffs. *See id*.

## ANALYSIS

As beneficiaries of a PACA trust in J&S's produce proceeds, Plaintiffs seek to disgorge purported PACA trust assets from South Central and Belmont, alleging that the banks received payments from J&S that should have been held in trust for Plaintiffs' benefit. Specifically, Plaintiffs allege that J&S transferred $655,264[5] in PACA trust assets to South Central between January 4, 2010 and August 31, 2011, and $676,654 to Belmont between July 30, 2010 and March 30, 2012.

Congress enacted PACA in 1930 to regulate the sale of perishable commodities. *Patterson Frozen Foods*, 307 F.3d at 667. Its original purpose was "to encourage fair trading

---

[5]    This sum is comprised of $565,264 in payments on the line of credit, $44,550 in payments on the Reliable Loan, an unspecified amount of payments on the mortgage loan, and $12,648 in bank fees and charges.

practices in the marketing of perishable commodities by suppressing unfair and fraudulent business practices." H.R. Rep. 98-543, at 3, 1984 U.S.C.C.A.N. 405, 406. PACA requires all qualifying produce merchants, dealers, and brokers to obtain licenses, and provides remedies that PACA trust beneficiaries may enforce through a complaint filed with the Secretary of Agriculture or through a court action for breach of fiduciary trust. *Patterson Frozen Foods*, 307 F.3d. at 669.

Congress amended PACA in 1984 to provide greater protection to produce wholesalers because, given the perishable nature of produce, wholesalers "are often placed in the position of being unsecured creditors of companies whose creditworthiness the seller is unable to verify." *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir. 1995). Because produce wholesalers were normally unsecured creditors, they "generally stood in line behind banks and other lenders who had obtained security interests in the defaulting purchaser's inventories, proceeds, and receivables. As a result, sellers were often unable to collect monies owed to them." *Am. Banana Co. v. Republic Nat. Bank of New York, N.A.*, 362 F.3d 33, 37 (2d Cir. 2004). Congress therefore amended PACA to create a statutory trust to benefit unpaid sellers of commodities. *Id.* The trust applies to the commodities themselves and the inventory or products derived from the commodities, as well as the proceeds therefrom. *Patterson Frozen Foods*, 307 F.3d at 669. Produce buyers "are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities." 7 C.F.R. § 46.46(d)(2). In other words, purchasers of perishable commodities, like J&S, must maintain the trust by "retaining the commodities or their proceeds until the commodities are paid." *Nickey Gregory Co., LLC v. Agricap, LLC*, 597 F.3d 591, 595 (4th Cir. 2010). Produce sellers, therefore, have priority over produce proceeds ahead of even

secured lenders. *Id.*; *Am. Banana*, 362 F.3d at 37. PACA grants district courts jurisdiction to hear "actions by trust beneficiaries to enforce payment from the trust." 7 U.S.C. § 499e(c)(5)(i).

A PACA trust is automatically created by the sale of produce on credit to a purchaser. *Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.*, 222 F.3d 132, 136 (3d Cir. 2000); *In re Kornblum & Co.*, 81 F.3d 280, 285 (2d Cir. 1996). As additional suppliers sell produce to a purchaser on credit, they join the "undifferentiated pool of trust beneficiaries, and the [p]roduce purchased from these suppliers becomes the property of the single PACA trust." *Kornblum*, 81 F.3d at 285. A PACA debtor or any party disputing that assets are subject to a PACA trust bears the burden of establishing that no trust existed when the unpaid-for produce was purchased. *Id.* at 287. While trust assets may be commingled with non-trust assets, a party challenging the scope of the trust bears the burden of tracing the origin of any disputed assets to demonstrate that those assets are not trust assets. *Id*. at 284; *Sanzone-Palmisano Co. v. M. Seaman Enters., Inc.*, 986 F.2d 1010, 1012 (6th Cir. 1993); *Six L's Packing Co. v. W. Des Moines State Bank*, 967 F.2d 256, 258 (8th Cir. 1992).

General trust principles govern PACA trusts so long as those principles do not conflict with the language of the Act. *Nickey Gregory*, 597 F.3d at 595. "Thus, when trust assets are held by a third party, resulting in the failure of the trustee to pay unpaid sellers of perishable agricultural commodities, the third party may be required to disgorge the trust assets unless the third party can establish that it has some defense, such as having taken the assets as a bona fide purchaser without notice of the breach of trust." *Id.* at 595–96.

## I.     Bona Fide Purchaser Defense

Both South Central and Belmont affirmatively contend that they were bona fide purchasers because they received PACA trust assets (1) in exchange for value, and (2) without

notice of the breach of the trust. *See* Restatement (Second) of Trusts § 284 (1959) ("If the trustee in breach of trust transfers trust property to . . . a person who takes for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction, the latter holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary."). In order to establish this defense, South Central and Belmont bear the burden of satisfying both the value and notice elements. *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 615 (2d Cir. 1998).

### A.     Transfers For Value

As to the first element, Plaintiffs acknowledge that loan payments from J&S to South Central and Belmont constitute transfers for value. *See* Doc. 170 at 13 ("Plaintiffs do not dispute that the line of credit and mortgage payments made by J&S to Belmont were 'for value' and ordinary course payments."). Transferring trust assets to satisfy a pre-existing debt normally does not satisfy the "for value" prong. Restatement (Second) of Trusts § 304(1) (1959); *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1380 (3d Cir. 1994). However, when the trust property that is transferred to satisfy a pre-existing debt is a negotiable instrument or money, such transfers meet the "for value" requirement. *Consumers Produce*, 16 F.3d at 1380. The rationale behind this exception is to promote confidence among businesses engaging in cash transactions. *C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311, 1314 (11th Cir. 1992) ("It is absolutely necessary for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payor." (quoting Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 304 (4th ed. 1989))). Given these principles and Plaintiffs' concession, the Court finds that J&S's loan

payments to Belmont and South Central satisfy the "for value" prong of the bona fide purchaser determination.

However, Plaintiffs contend that the overdraft fees J&S paid to the banks were not ordinary course payments and therefore do not constitute transfers for value. Plaintiffs cite precedent from the Eleventh and Third Circuits for the proposition that

> when secured lenders use their security agreement to foreclose on property or otherwise enforce their contractual rights, they essentially force the transfer of trust property in satisfaction of an antecedent debt. Any such transfer, including transfers of negotiable instruments and money, through the exercise of rights under a security agreement is not for value.

*C.H. Robinson*, 952 F.2d at 1316 n.5. Stated another way, "[t]he 'for value' portion of the bona fide purchaser standard thus only protects secured lenders who receive PACA trust assets in the ordinary course of business. Lenders who seize PACA trust assets through the enforcement of a security agreement will not be protected by the bona fide purchaser defense." *Consumers Produce*, 16 F.3d at 1380 n.3. Even though there is no evidence before the Court that South Central or Belmont ever attempted to foreclose or threatened to foreclose on J&S's accounts, Plaintiffs attempt to extend the *C.H. Robinson* and *Consumers Produce* rationale to this case.

In response, South Central and Belmont point out that they did not "seize" J&S's assets, "foreclose" on its account, or otherwise "force" J&S to pay overdraft fees. South Central and Belmont rely on the premise that "costs associated with maintaining an account for PACA trust funds does not breach a PACA trustee's obligations provided the costs are commercially reasonable." *D.M. Rothman & Co. v. Korea Commercial Bank of N.Y.*, 411 F.3d 90, 100 (2d Cir. 2005). South Central and Belmont also cite *E. Armata, Inc. v. Korea Commercial Bank of New York*, where the Second Circuit held that "a PACA trustee's payment of interest and fees to maintain a checking account with overdraft privileges does not *per se* constitute breach of the PACA trust." 367 F.3d 123, 133 (2d Cir. 2004). The Second Circuit found that maintaining a

checking account with overdraft protection in exchange for a commercially reasonable fee may actually assist a PACA trustee in meeting its obligations to PACA creditors. *Id.* at 133–34. South Central and Belmont assert that because their overdraft charges were commercially reasonable, payments on those charges were made in exchange for value.

On the record before it, the Court agrees with South Central and Belmont that J&S's payments of overdraft and other fees constitute transfers for value to the extent that they were commercially reasonable. *Id.* at 133. In exchange for these payments, J&S received a checking account with overdraft privileges and access to additional funds. *Id.* at 134 ("Indeed, it is difficult to imagine how a PACA trustee would make funds available to its PACA creditors without entering into some such relationship with a bank."). Additionally, this result corresponds to the principle that "[i]t is absolutely necessary for practical business transactions that the payee of money in due course of business shall not be put upon inquiry at his peril as to the title of the payor." *C.H. Robinson*, 952 F.2d at 1314. Whether the charges were commercially reasonable is a question of fact for the jury.

### B.     Notice

The bulk of the argument in the papers discusses the second prong of the bona fide purchaser defense—whether South Central and Belmont were on notice that J&S had breached the trust. Again, the burden is on South Central and Belmont to establish that they had no notice of J&S's breach of the PACA trust when they received payments from J&S. *Albee Tomato*, 155 F.3d at 615. Plaintiffs may recover if South Central and Belmont had actual notice or constructive notice of J&S's breach of trust. Constructive notice is defined as when the transferee should know of the breach. Restatement (Second) of Trusts § 297 (1959). Specifically, a transferee should know of a breach:

> when he knows facts which under the circumstances would lead a reasonably
> intelligent and diligent person to inquire whether the trustee is a trustee and
> whether he is committing a breach of trust, and if such inquiry when pursued with
> reasonable intelligence and diligence would give him knowledge or reason to
> know that the trustee is committing a breach of trust.

*Id*. Thus, the Restatement's definition of constructive notice includes what some courts have called "inquiry notice," where a party may be required to inquire into the financial health of the trust. *Consumers Produce*, 16 F.3d at 1383 ("Thus, a duty of inquiry arises when a person knows facts which under the circumstances suggest (1) that the person is dealing with a trustee and (2) that the trustee may be committing a breach of trust. If a duty of inquiry exists, and such inquiry would have disclosed the breach of trust, a person "should have known" of the breach of trust.").

The question of notice often requires a factual determination that is not appropriate for summary judgment. *See Albee Tomato*, 155 F.3d at 617 (reversing summary judgment, holding that factual questions regarding the defendant's notice precluded summary judgment); *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 1000 (11th Cir. 1997) (reversing summary judgment, noting that "genuine issues of material fact exist as to whether the bank was a bona fide purchaser and whether the bank was without notice of GMS's breach of the PACA trust"). The relevant question is not merely whether South Central or Belmont had notice that J&S was subject to a PACA trust, but whether the banks had actual or constructive notice that J&S had breached its PACA trust obligations. *See Consumers Produce*, 16 F.3d at 1383.

Here, Plaintiffs allege that South Central and Belmont knew sufficient facts to put them on notice that J&S may be in breach of its trust obligations and that had South Central or Belmont inquired they would have learned that J&S had breached its obligations. Plaintiffs point out that South Central and Belmont knew that J&S was experiencing cash flow problems, evidenced by J&S repeatedly requesting additional credit and overdrawing its checking account

while it maintained accounts at each bank. Specifically, during the summer of 2009, J&S asked South Central to increase its line of credit from $300,000 to $600,000 as a result of slow paying customers. Plaintiffs contend that from this request, "South Central knew in June or July of 2009 that J&S had significant cash flow problems." Doc. 217 at 6. Belmont ultimately obtained J&S's business only after it offered to more than double J&S's line of credit. J&S's owner James Stamas testified that "at some point" before J&S moved its business to Belmont it "had stopped becoming profitable" and that J&S was "having a hard time collecting on a lot of the receivables." Doc. 148-5 at 27. Plaintiffs also point out that J&S was subject to a temporary restraining order in August 2009 after it failed to pay a PACA creditor's invoices. South Central received service of the temporary restraining order, but accepted J&S's explanation that it was no more than a "dispute with a supplier and that it would be taken care of immediately." Doc. 216 ¶ 8. South Central and Belmont were aware that J&S took an average of 68 days to pay its accounts payable, more than double the industry average. Additionally, South Central put J&S on a "watch list" of potentially troubled loans in 2009 and again in 2010. South Central steadily increased J&S's risk code from 3 in September of 2009 to 7 in July of 2010.[6] Moreover, both South Central and Belmont were contractually entitled to review J&S's complete books and records, and while both banks requested and reviewed specific documents, neither bank exercised nearly all of its rights.

South Central and Belmont contend that they had no notice of J&S's breach until March 21, 2012, when they received service of the temporary restraining order in this case. South Central and Belmont contend that it was not unusual for high volume businesses like J&S to experience overdraft fees. South Central and Belmont further note that J&S was financially

_____

[6] South Central assessed risk codes on a scale of 1 to 10 where 1 is the least risky and 10 is the most risky. Risk codes from 1 through 7 are commercially acceptable under South Central's underwriting criteria.

healthy through June of 2011 because it paid all of its invoices dated between April of 2010 and June 24, 2011. South Central and Belmont also point to a balance sheet indicating that as of December 31, 2009 J&S had current assets in excess of $3 million and accounts payable of less than $1.5 million. J&S's March 31, 2010 balance sheet showed current assets of almost $1.9 million and accounts payable of only $157,576. James Stamas testified that J&S "was still doing well" as of April of 2010. Doc. 148-5 at 27. South Central also points out that it never assigned J&S a risk code that would make J&S a commercially unacceptable borrower.

Thus, the record reveals that J&S was profitable in 2010 and at least occasionally maintained cash reserves far in excess of its accounts payable, while also at least occasionally overdrawing its account. The evidence further shows that J&S historically paid all but a few of its PACA creditors through June of 2011, but that it often paid late. At some point, J&S's cash position changed significantly, as it stopped paying its creditors altogether in June of 2011 and filed for bankruptcy in March of 2012. It is not clear from the record when specifically J&S's circumstances changed from its large cash surplus on March 31, 2010 to not paying its PACA creditors' invoices dated June of 2011. Nor does the record reveal what caused J&S's finances to devolve so rapidly. More importantly for purposes of the pending motions, the Court cannot determine on the record before it what South Central and Belmont knew or should have known about J&S's deteriorating finances and when they knew it or should have known it. On this evidence, the Court finds that genuine issues of material fact with regard to South Central and Belmont's knowledge, and whether that knowledge constituted sufficient notice, preclude summary judgment for either Plaintiffs or Defendants.

## II.     Other Defenses

### A.     Date of Breach

South Central also claims that it cannot be liable because J&S did not breach its PACA trust until after J&S moved its business to Belmont in May of 2010.  But this ignores the breaches of the trust created when J&S failed to pay Windsor, Gourmet's Finest, and Strube.  While J&S might have been financially healthy on the date of its last payment to South Central, J&S clearly breached its PACA trust obligations well before terminating its relationship with South Central.  Namely, Gourmet's Finest filed a PACA claim against J&S related to unpaid invoices from October of 2009 through March of 2010.  To date, J&S has not satisfied its obligations to Gourmet's Finest.  J&S also failed to pay Strube's invoices dated April of 2010 and has not completely satisfied its debt to Strube.  The terms of PACA indicate that trust assets must be held "for the benefit of all unpaid suppliers" and the trust remains in place until the suppliers receive "full payment of the sums owing."  7 U.S.C.A. § 499e(c)(2).  Therefore, there is at least a question of fact with regard to whether J&S's breaches of the PACA trust in 2009 and 2010 persist, as Gourmet's Finest and Strube remain unpaid.  *Cf. Greg Orchards & Produce, Inc. v. Roncone*, 180 F.3d 888, 892 (7th Cir. 1999) (holding that a PACA creditor's agreement with a debtor to enter into a forbearance agreement renders the creditor ineligible to assert its PACA trust rights).  None of the submitted statements of fact describe the terms of J&S's agreements with Gourmet's Finest or Strube such that the Court could conclude that *Greg Orchards* governs those agreements and mandates that Gourmet's Finest or Strube have forfeited their PACA trust rights.[7]

---

[7]     Nor do the parties address whether and to what extent the holding in *Greg Orchards* affects the date on which J&S may be held to have breached its PACA trust obligations.

In its response to Plaintiffs' motion for summary judgment, Belmont accuses Strube of a "suspicious and tenuous attempt to back date its claims to April 2010" and asserts that "[t]here is no corroboration that Strube had unpaid invoices at any date and certainly not as far back as 2010." Doc. 180 at 13. But the record reveals nothing suspicious and no corroboration is necessary, as at least South Central explicitly acknowledges that "J&S also owed money to [Strube] in April 2010," and that this debt remains unpaid. Doc. 174 ¶¶ 10, 12.

### B.    Lack of Injury

South Central also contends that J&S's PACA creditors were not injured by J&S's payments on the revolving line of credit. South Central contends that the nature of the line of credit distinguishes this case from others because during the period in which South Central collected $565,264 in line of credit payments from J&S, it transferred $582,442 to J&S. South Central contends that the line of credit actually benefitted Plaintiffs because it "simply gave J&S more available cash to pay Plaintiffs' invoices." Doc. 175 at 14.

However, South Central fails to meaningfully distinguish cases where courts found that payments on a line of credit may be subject to disgorgement under PACA. *See Nickey Gregory*, 597 F.3d at 607 (affirming summary judgment for the plaintiffs, finding that the plaintiffs could disgorge collections on a loan that was essentially a line of credit); *Gargiulo*, 131 F.3d at 1000 (reversing summary judgment in favor of the lender who provided a line of credit to a PACA debtor). South Central attempts to distinguish *Nickey Gregory* by asserting that South Central "collected <u>nothing</u> from J&S and paid <u>nothing</u> to itself from" the proceeds of J&S's produce sales. Doc. 175 at 14. South Central cites *Nickey Gregory* for the proposition that merely taking a security interest in a PACA debtor's accounts receivable did not violate PACA, it was the lender's collection on those accounts and its acceptance of proceeds ahead of the commodities

sellers that rendered it liable to the produce sellers. *Nickey Gregory*, 597 F.3d at 603. South Central misreads *Nickey Gregory* and attempts to distinguish between the payments on a line of credit the defendant bank collected there, with the payments South Central received here. *Nickey Gregory* affirmed summary judgment for the plaintiffs after finding that "[i]t is not disputed that, in this case, [the finance company] used its position as collection agent and lender to satisfy [the PACA debtors'] obligations to it ahead of [the debtors'] obligations to its PACA creditors." *Id.* at 603–04. This is exactly what happened here. It is not disputed that, as a secured creditor to J&S, South Central received $565,264 in payments from J&S on the revolving line of credit during the relevant period.

While the fact that South Central also provided funds to J&S is relevant to the question of whether the transfers were for value, it does not render Plaintiffs uninjured. For example, South Central must agree that if a bank provided a lump sum loan to a PACA debtor and then collected regular payments on that loan, the bank could not avoid disgorgement on the debtor's repayments merely by asserting that it provided even more capital at the front end than it received from the debtor. After all, South Central provided such a lump sum to J&S in the form of the mortgage loan, and South Central apparently concedes that J&S's payments on the mortgage harmed Plaintiffs. South Central fails to explain why payments on the line of credit are any different from the payments on the mortgage loan in this context and the Court does not see any valid distinction.

Moreover, this argument simply misinterprets the purpose of PACA. It is undisputed that Plaintiffs remain unpaid for invoices totaling over $1.6 million. Despite South Central's repeated contention that a judgment in Plaintiffs' favor would constitute a "windfall," *see, e.g.*, Doc. 175 at 3, 17; Doc. 219 at 12, Plaintiffs merely seek to recoup debts they are owed. The

question before the Court is not, as South Central contends, "[w]hat . . . South Central should have done [differently] with respect to the Revolving Line?" Doc. 219 at 12. The Court need not find that South Central acted maliciously or underhandedly in order to disgorge payments. Instead, this is a case where there are not enough assets to go around and the question is which party is entitled to the assets that are available. In creating a statutory trust, PACA does not seek to assign blame to one party or another when a produce purchaser defaults; rather, the statute sets out that unpaid wholesalers who have retained their PACA trust rights have priority in repayment of the debts of a defaulting borrower. *Nickey Gregory*, 597 F.3d at 595 ("Congress enacted the 1984 amendments to protect the commodities sellers by giving them a priority position over even secured creditors."). While "[t]his reordering of priorities" may cause banks like South Central to increase the cost of capital to produce buyers or to forego making such loans altogether, "[t]he judiciary . . . should not insert itself in these policy matters by questioning or debating legislative judgments, as it is constituted only to comprehend, interpret, and apply what Congress has duly provided." *Id.* at 608. South Central and Belmont almost certainly "anticipate a level of protection from their secured creditor positions. Their efforts, however, are trumped by Congress' policy choice to give produce suppliers a favored creditor position, not only in the produce [J&S] sell[s], but also in derivative products and commingled proceeds in the hands of PACA dealers." *Id.* at 607. Therefore, the Court rejects South Central's argument that Plaintiffs cannot recover as a matter of law on the line of credit payments because they were not injured.

### C.      Payments on the Reliable Loan

Plaintiffs seek to disgorge $44,550 in payments J&S made on the Reliable Loan. South Central argues that Plaintiffs are not entitled to disgorge these payments as they were never PACA trust assets. South Central contends that Reliable provided all the funds to satisfy these

payments and merely "parked" those funds in J&S's account before making payments to South Central. While commingling of PACA trust funds with non-PACA funds is allowed, South Central bears the burden of demonstrating that the payments on the Reliable Loan did not come from PACA trust assets. *Six L's Packing*, 967 F.2d at 258. Furthermore, "the mere fact that non-trust funds were temporarily parked in an account containing trust funds is not enough to convert those non-trust funds into trust assets, as it is permissible to commingle PACA trust assets with non-trust assets." *Id*.

Reliable and J&S are affiliates. Together, Reliable and J&S obtained a loan from South Central, using J&S assets as collateral. However, the record reveals that Reliable paid off the loan exclusively with its own funds. Reliable wrote seven checks to J&S, each for $8,900. J&S deposited these seven checks into its account on January 21, 2011, February 22, 2011, March 18, 2011, April 21, 2011, May 23, 2011, June 21, 2011, and July 22, 2011. J&S then made seven transfers of $8,910 each (including a $10 servicing fee) to South Central on January 26, 2011, March 21, 2011, March 22, 2011, April 25, 2011, May 25, 2011, June 23, 2011, and July 22, 2011.

Plaintiffs do not respond to South Central's argument that the Reliable Loan payments are not subject to PACA. The undisputed record reveals that Reliable paid off the loan exclusively with its own funds. And there is no evidence that Reliable is itself a PACA debtor. Therefore, because Reliable merely "parked" its assets in J&S's account, normally for a matter of days, before J&S transferred those funds to South Central, the Court finds that these payments were never a part of the PACA trust. *See id*. Therefore, the Court grants South Central summary judgment with regard to the $45,550 in payments it received on the Reliable Loan.

### D.     Non-Produce Sales

South Central also contends, briefly, that even if the Court disgorges funds that the bank collected from J&S, the Court should allow South Central to retain 50% of the payments it received because "[o]nly about 50% of J&S's business came from produce sales."  Doc. 175 at 21.  In support of this proposition, South Central relies on *Six L's Packing*, where the Eighth Circuit affirmed the district court's holding that PACA creditors could disgorge only 75% of a PACA debtor's payments to a bank because 25% of the debtor's income came from non-produce sales.  *Six L's Packing*, 967 F.2d at 259.  The *Six L's Packing* court noted, however, that this issue is very similar to the question of commingling of PACA trust assets with non-trust assets. *Id*.  While commingling is permitted, the burden is on the party challenging disgorgement to demonstrate that certain funds were not PACA trust funds.  Here, aside from payments on the Reliable Loan, neither South Central nor Belmont has demonstrated that any of the payments either bank received came from non-PACA assets such that the Court could make such a determination on summary judgment.  Because questions of fact pervade on this issue, the Court rejects, at the summary judgment stage, South Central's argument that Plaintiffs can only disgorge 50% of J&S's payments to the bank.

### E.     Payments on the Mortgage Loan

Finally, South Central argues that J&S's payments on the mortgage loan did not violate PACA because those payments "were really just its rent payments."  Doc. 175 at 16.  South Central asks the Court to conclude that "as with reasonable bank fees – a PACA trustee may incur and pay ordinary rent payments."  *Id*.  South Central, however, does not develop this argument.  Nor does South Central cite any case law for the proposition that rent payments are not subject to disgorgement by PACA trust beneficiaries.  And it is far from clear on the record

that South Central's mortgage payments were, in fact, "really just its rent payments." *Id*. The record reveals that J&S entered a real estate loan with South Central in the amount of $2.6 million secured by the property at 2300 W. Lake Street, which J&S occupied. J&S initially paid off the mortgage via an intermediary called 2300 W. Lake St. LLC, but then "decided to eliminate the middle man and have J&S pay the loan payments for the Real Estate Loan directly to South Central Bank." Doc. 174 ¶ 33. Without explaining why, South Central contends that the existence of the intermediary overcomes the reality that J&S obtained a loan secured on real property and then repaid the loan while its PACA trust beneficiaries went unpaid. The Court is not convinced. The Court finds that, at the very least, questions of fact preclude summary judgment in South Central's favor on the payments on the mortgage loan.

## CONCLUSION

For the reasons stated above, Plaintiffs' motions for summary judgment [146, 149] are denied, as questions of fact with regard to South Central Bank's and Belmont Bank's notice of the breach preclude summary judgment. Intervening Plaintiff Central Produce's motion for summary judgment [158] is denied as moot in its entirety because Central Produce seeks judgment only against parties who have been dismissed from this case. The Court also denies Belmont Bank's motion for summary judgment [161] because questions of fact regarding its knowledge of J&S's breach preclude summary judgment. The Court grants South Central's motion for summary judgment [175] with regard to J&S's payments on the Reliable Loan. The Court denies the remainder of South Central's motion because the record does not reveal whether South Central had notice of J&S's breach.

Dated: September 30, 2014

SARA L. ELLIS
United States District Judge